T.C. Memo. 2014-1

UNITED STATES TAX COURT

NAJEEM B. ADEYEMO AND OLUBUNMI A. ADEYEMO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3780-12.                    Filed January 2, 2014.

Najeem B. Adeyemo and Olubunmi A. Adeyemo, pro se.

Bradley C. Plovan, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The respondent in this case (the "IRS") issued a

notice of deficiency to the petitioners, Mr. Najeem B. Adeyemo and Mrs.

Olubunmi A. Adeyemo, for the tax years 2008 and 2009.  The Adeyemos filed

joint federal income tax returns for 2008 and 2009.  For 2008 the IRS determined

[*2] a deficiency of $32,631[1] and an accuracy-related penalty under section 6662(a) of $6,526. For 2009 the IRS determined a deficiency of $32,799 and an accuracy-related penalty under section 6662(a) of $6,560.

The Adeyemos timely filed a petition under section 6213(a) for redetermination of the deficiencies.[2] We have jurisdiction under section 6214. After concessions, the following issues for decision remain:

(1)     Is the Adeyemos' rental real-estate business a passive activity? We hold that the business is a passive activity.

(2)     Does the allowance provided by section 469(i) apply to the Adeyemos' rental real-estate business? We hold that the allowance does not apply.

(3)     Are the Adeyemos entitled to any deductions for their rental real-estate business (setting aside the effect of the passive-activity loss limitations of section 469), any medical-expense deductions, or any charitable-contribution deductions in excess of those allowed by the IRS? We hold that they are not so entitled.

---

[1]All dollar amounts have been rounded to the nearest dollar.

[2]At the time they filed the petition, the Adeyemos resided in Maryland. Thus, this case is appealable to the U.S. Court of Appeals for the Fourth Circuit unless the parties stipulate otherwise. Sec. 7482(b)(1)(A).

**[\*3]**   (4)   Were the Adeyemos insolvent immediately before they received a discharge of $32,926 in credit-card debt in 2009?  We hold that they were not insolvent.

(5)   Are the Adeyemos liable for accuracy-related penalties under section 6662(a)?  We hold that they are liable.

All section references are to the Internal Revenue Code as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The Adeyemos are a married couple living in Laurel, Maryland.  Mrs. Adeyemo had a full-time job working as a pharmacist throughout 2008 and 2009.  Mr. Adeyemo worked as a pharmaceutical sales representative in 2008 and 2009.  He was unemployed for approximately five months in 2009.  On their joint returns the Adeyemos reported total wage income of $232,992 and $175,354 for 2008 and 2009, respectively.  These amounts were not challenged by the IRS.

In addition to their day jobs, the Adeyemos owned and managed seven rental properties in various cities in Maryland.  Mr. Adeyemo performed the bulk of the management tasks with respect to the rental properties himself.  The couple did not employ an outside management company.  The activities Mr. Adeyemo

[*4] conducted included, among other things, maintaining and repairing the properties, overseeing maintenance crews, showing the properties to prospective tenants, collecting rent, and occasionally bringing eviction actions against tenants in Maryland state court.

Perhaps as a result of the financial crisis, in 2008 and 2009 the Adeyemos experienced increased difficulty renting out properties and collecting rent from tenants. This created more work than was usual for Mr. Adeyemo as he was forced to devote more time to finding credit-worthy tenants and collecting rent from existing tenants. The Adeyemos' rental real-estate business proved unprofitable during the years at issue, and the couple suffered losses on the business.

On their 2008 and 2009 Schedules E, "Supplemental Income and Loss", the Adeyemos claimed aggregate expenses of $300,403 and $202,981, respectively, associated with the seven rental properties. On the Schedules E these expenses were separated into the following categories: depreciation, interest, property taxes, insurance, maintenance, repairs, advertising, auto and travel, and various fees. For each expense category, the amount of the expense was further subdivided among the seven properties. The Adeyemos reported net losses from the seven properties of $171,651 for 2008 and $96,806 for 2009. They did not

**[*5]** treat their rental real-estate business as a passive activity, and they deducted these net losses from other income on their Forms 1040, "U.S. Individual Income Tax Return". In addition to the deductions they claimed for the expenses of their rental real-estate business, the Adeyemos reported a charitable-contribution deduction of $21,300 and a medical-expense deduction of $12,054 on their 2009 Schedule A, "Itemized Deductions". They reported tax liabilities of zero for 2008 and $3,016 for 2009.

The IRS sent the Adeyemos a notice of deficiency for 2008 and 2009. For each year the notice of deficiency made the following determinations with respect to the income and expenses attributable to the Adeyemos' rental real-estate business.

1. The notice disallowed--on grounds of lack of substantiation--some of the deductions the Adeyemos claimed for the expenses of their rental real-estate business.[3]

---

[3]The deductions disallowed for lack of substantiation were: (1) all the deductions for advertising expenses, (2) all the deductions for auto and travel expenses, (3) portions of the deductions for expenses for repairs, insurance, cleaning and maintenance, and interest. In total, the notice disallowed on lack-of-substantiation grounds $44,362 of the $300,403 of claimed deductions for the rental real-estate business for 2008 and $36,475 of the $202,981 of claimed rental real-estate business deductions for 2009.

[*6]  2.  The notice determined that neither Mr. Adeyemo nor Mrs. Adeyemo qualified as a real-estate professional and that therefore the Adeyemos' rental real-estate business was a passive activity.  See sec. 469(c)(2) (a passive activity includes any rental activity except as provided in section 469(c)(7)), 469(c)(7) (section 469(c)(2) does not apply to any rental activity of a taxpayer who is a real-estate professional).

3.  The notice determined that the Adeyemos' only income from passive activities was their income from their rental real-estate business.[4]  (The notice did not make any adjustments to income from the rental real-estate business reported by the Adeyemos on their returns.)

4.  The notice determined that the Adeyemos did not qualify for the rental real-estate allowance provided by section 469(i).

As a consequence of these determinations, the notice of deficiency made the following computations.

---

[4]This determination affects the calculation of the passive activity loss.  See sec. 469(d)(1) (defining a passive activity loss as the amount by which the aggregate losses from all passive activities exceed the aggregate income from all passive activities).

**[\*7]** 1.  The deductions for the rental real-estate business (as reduced by the deductions disallowed by the IRS on lack-of-substantiation grounds) exceeded, and offset completely, all income from the rental real-estate business.

2.  The amount by which (a) the deductions for the rental real-estate business (as reduced by the deductions disallowed by the IRS on lack-of-substantiation grounds) exceeded (b) income from the rental real-estate business was a passive activity loss and was not currently deductible.  See sec. 469(a)(1), (b).

**[*8]** These adjustments are summarized in the following table:

| Income and deductions attributable to rental real-estate business | 2008 | 2009 |
|---|---|---|
| Gross income (reported) | $128,752 | $106,175 |
| Deductions (reported) | 300,403 | 202,981 |
| Net loss (reported) | –171,651 | –96,806 |
| Deductions disallowed in the notice of deficiency on lack-of-substantiation grounds | 44,362 | 36,475 |
| Deductions allowed in the notice of deficiency (before application of the passive-loss-disallowance rule) | 256,041 | 166,506 |
| Net loss, as adjusted in the notice of deficiency (The notice of deficiency reduced the net loss by the deductions disallowed for lack of sub-stantiation and determined that the amount of the net loss, so reduced, was a passive-activity loss.) | –127,289 | [1] –60,331 |

[1]The passive-activity loss stated in the notice of deficiency was –$60,311. According to our to our review of all adjustments in the notice, this amount understates the passive-activity loss by $20. Thus, the amount of the passive-activity loss should have been –$60,331.

With respect to the Adeyemos' personal (i.e., non-business) expenses and income, the notice of deficiency made the following determinations: that the

**[\*9]** charitable-contribution deduction for 2009 should be $21,135 instead of the $21,300 reported on the return; that the medical-expense deduction for 2009 should be $7,927 instead of the $12,054 reported on the return; and that the Adeyemos failed to report $32,927 of income arising from discharge of indebtedness in 2009.

At trial, the IRS confronted Mr. Adeyemo with evidence that during an audit of the couple's 2008 and 2009 returns he had given the IRS forged or altered receipts purporting to show that the couple had made payments for expenses related to their rental real-estate business. The receipts generally provided the amount paid, the purpose of the expense, and the property to which the expense related. The Court admitted the receipts for the limited purpose of impeaching Mr. Adeyemo's credibility as a witness. Mr. Adeyemo admitted in testimony that he had forged or altered the receipts.

The Adeyemos' certified public accountant who prepared the couple's 2008 and 2009 returns testified at trial. The accountant was present at the audits of the Adeyemos' 2008 and 2009 returns. The accountant's testimony related to the conduct of the IRS agents at the audits and the types of questions the agents asked. The accountant did not testify about his professional background or any advice he gave the Adeyemos at the time they filed their 2008 and 2009 returns.

[*10]   Also at trial, the Adeyemos introduced some 300 pages of documents apparently related to their rental real-estate business.  The documents were in no discernible order and consisted primarily of receipts, invoices, leases, and court documents.  The Adeyemos did not explain how the documents corroborate their position other than to suggest that the documents demonstrate the significant amount of time and effort that went into managing the couple's rental properties.

OPINION

With respect to determinations in the notice of deficiency, the taxpayer generally bears the burden of proof.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof is satisfied by a preponderance of the evidence.  Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987).  If the taxpayer shows that the requirements of section 7491(a)(1) and (2) are satisfied, the burden of proof shifts to the IRS.  Higbee v. Commissioner, 116 T.C. 438, 442 (2001).  Section 7491(a)(1) requires the taxpayer to present credible evidence with respect to factual issues relevant to ascertaining the taxpayer's tax liability.  Credible evidence is evidence that, after critical analysis, would constitute a sufficient basis for deciding the issue in favor of the taxpayer if no contrary evidence were submitted.  Ocmulgee Fields, Inc. v. Commissioner, 132 T.C. 105, 114 (2009), aff'd, 613 F.3d 1360 (11th Cir. 2010); Higbee v. Commissioner, 116

**[*11]** T.C. at 442. Section 7491(a)(2) requires the taxpayer to comply with substantiation and record-keeping requirements and cooperate with the IRS's reasonable requests for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B). The taxpayer bears the burden of proving that the requirements of section 7491(a) have been met. See Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

With respect to the first issue--whether the Adeyemos' rental real-estate business is a passive activity--all of our findings are based on the preponderance of the evidence. Therefore, it is not necessary to determine which party has the burden of proof. Knudsen v. Commissioner, 131 T.C. 185, 189 (2008). With respect to the second issue--whether the allowance provided by section 469(i) applies to the Adeyemos' rental real-estate business--we determine that the allowance is inapplicable for reasons that do not require the resolution of any disputed facts. Therefore, the identity of the party bearing the burden of proof is irrelevant. See Nis Family Trust v. Commissioner, 115 T.C. 523, 538 (2000); Riether v. United States, 919 F. Supp. 2d 1140, 1148 (D.N.M. 2012). With respect to the third issue--the availability of various types of deductions--the Adeyemos provided no evidence--credible or incredible-- with respect to the charitable-contribution and medical-expense deductions. Therefore, they bear the burden of

**[\*12]** proof with respect to the charitable-contribution and medical-expense deductions.[5]  See sec. 7491(a)(1).  With respect to the fourth issue--the insolvency issue--the Adeyemos presented no evidence other than Mr. Adeyemo's bare testimony that the Adeyemos had $2.2 million of debt.  This testimony is unpersuasive in the absence of more specific evidence of the Adeyemos' net worth, including their debts and their assets.  Thus, the Adeyemos have not presented credible evidence with respect to the insolvency issue.  They therefore bear the burden of proof with respect to this issue.  See id.

1.      Whether the Adeyemos' rental real-estate business is a passive activity

Sections 162 and 212 generally permit taxpayers to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business or for the production of income.  In the case of an individual, section 469 disallows any current deduction for a passive activity loss.  Sec. 469(a)(1), (b).  A passive activity loss is equal to the aggregate losses from all of the taxpayer's passive activities minus the aggregate income from all passive activities.  Sec. 469(d)(1).[6]

---

[5]As we find that the Adeyemos have abandoned the argument that they are entitled to business-expense deductions that were disallowed by the IRS on lack-of-substantiation grounds, see infra pp. 27-28, we need not determine whether they bear the burden of proof for that issue.

[6]The effect of the passive-activity-loss disallowance rule is that deductions
(continued...)

**[*13]** Generally, a passive activity is any trade or business in which the taxpayer does not materially participate.  See sec. 469(a)(1), (c)(1).

Rental activity (including rental real-estate activity) is per se passive unless the taxpayer qualifies as a real-estate professional as defined in section 469(c)(7)(B).  Sec. 469(c)(2).  If the taxpayer qualifies as a real-estate professional, the taxpayer's rental real estate activity escapes the per se rule otherwise applicable to rental activity.  Sec. 469(c)(2), (7)(A).  A taxpayer qualifies for the exception for real-estate professionals only if the following two requirements are met:

> (i) more than one-half of the personal services performed by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

---

[6](...continued)
related to passive activities are allowed against income from passive activities and the excess (i.e. the amount by which the deductions related to passive activities exceed the income from passive activities) cannot be deducted from income from activities other than passive activities.  See Krukowski v. Commissioner, 279 F.3d 547, 549 (7th Cir. 2002) ("[Section] 469 prohibits the deduction of passive activity losses, except insofar as the losses are used to offset passive activity income."), aff'g 114 T.C. 366 (2000).  Wage income and portfolio investment income are not treated as income from passive activities.  See secs. 469(e)(1), (3), 911(d)(2)(A); Beecher v. Commissioner, 481 F.3d 717, 721 (9th Cir. 2007) (wage income is not passive income), aff'g Cal Interiors, Inc. v. Commissioner, T.C. Memo. 2004-99.

**[\*14]**   (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

Sec. 469(c)(7)(B).  In the case of a joint return, the above requirements are satisfied if, and only if, either spouse separately satisfies both requirements.  Id. Thus, the couple's activities cannot be aggregated for purposes of qualification as a real-estate professional.  Id.

A regulation provides guidance regarding the types of proof to be used in determining the extent of an individual's participation in an activity.  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).  The regulation provides:

> The extent of an individual's participation in an activity may be established by any reasonable means.  Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

We have held that this regulation governs the type of proof to be used in determining the hours of service spent by an individual in real-property trades or businesses.  Moss v. Commissioner, 135 T.C. 365, 369-371 (2010) (the regulation governs the acceptability of proof offered by a taxpayer to show that he performed

**[*15]** more than 750 hours of services in real-property trades or businesses). The regulation does not permit a post-event "ballpark guesstimate". Id. at 369 (citing Bailey v. Commissioner, T.C. Memo. 2001-296). In addition, the taxpayer's uncorroborated testimony need not be relied on. Bailey v. Commissioner, slip op. at 13-14.

Against the IRS's argument that their rental real-estate business is a passive activity, the Adeyemos' sole contention is that they qualify for the exception for real-estate professionals. The Adeyemos do not contend that Mrs. Adeyemo was a real-estate professional in either 2008 or 2009. Therefore, we focus only on whether Mr. Adeyemo was a real-estate professional. In making this determination we assume (without deciding) that: (1) the Adeyemos' rental real-estate business constitutes a real-property trade or business and (2) Mr. Adeyemo materially participated in the Adeyemos' rental real-estate business. Even with these favorable assumptions, Mr. Adeyemo did not qualify as a real-estate professional in 2008 or 2009. For reasons given below, we find that Mr. Adeyemo performed 1,500 hours of personal services working as a pharmaceutical sales representative during 2008 but that he performed no more than 800 hours in the Adeyemos' rental real-estate business. This means that less than 35% of the hours of personal services performed by Mr. Adeyemo during 2008 were performed in

**[*16]** the Adeyemos' rental real-estate business in that year.[7]  This amount is less than the 50%, i.e., one-half, required by section 469(c)(7)(B)(i).  We also find that Mr. Adeyemo performed no more than 715 hours of personal services in the Adeyemos' rental real-estate business in 2009.  This amount is less than the 750 hours required by section 469(c)(7)(B)(ii).  These findings are summarized in the following table:

|  | 2008 | 2009 |
|---|---|---|
| (1) Hours of personal services performed by Mr. Adeyemo in the Adeyemos' rental real-estate business | ≤ 800 | ≤ 715 hours |
| (2) Hours of personal services performed by Mr. Adeyemo outside the Adeyemos' rental real-estate business | 1,500 | unresolved |
| row (1) + row (2) | ≤ 2,300 | unresolved |
| row (1) / (row (1) + row (2)) | < 35% | unresolved |

We now explain our reasoning.

The Adeyemos provided three primary sources of support for their position that Mr. Adeyemo was a real-estate professional:  (1) a logbook, (2) a spreadsheet prepared for trial, and (3) testimony.  We discuss each source in turn.

---

[7]The fraction 800 / (800 + 1500) equals 34.78%.

**[*17]**  At trial, the Adeyemos introduced (and the Court admitted into evidence) a logbook that provides an almost-daily account of the activities that Mr. Adeyemo conducted with respect to the couple's rental properties.  These activities include showing properties to prospective tenants, picking up rent, and overseeing work crews.  Each entry includes a date, a description of the activities that Mr. Adeyemo performed on that date, and the amount of time he devoted to the respective activities.

Mr. Adeyemo testified that the logbook entries were made contemporaneously with the events in question and accurately depict his involvement with the rental properties.  The IRS contends that we should not rely on the logbook because, the IRS argues, it is vague and was likely created shortly before trial.[8]  The IRS's position that the logbook is not contemporaneous is supported by at least two points in the record.  First, Mr. Adeyemo provided inconsistent answers in response to IRS counsel's questions concerning when and why the Adeyemos began to maintain the logbook.  As to what year the couple

---

[8]As an out-of-court statement, the logbook could potentially be subject to a hearsay objection, but the IRS did not object to the logbook on hearsay grounds, and the Court admitted the logbook.  See Fed. R. Evid. 802 (prohibiting admission of hearsay), 801(c)(1) (defining hearsay generally as a statement not made while testifying at the trial).  The IRS objected to the logbook on grounds other than hearsay, but the Court overruled the objection.

[*18] began to maintain the logbook, Mr. Adeyemo gave multiple inconsistent answers: 2005, 2007, and 2008. In addition, the IRS auditor credibly testified that, prior to the Adeyemos' audit, Mr. Adeyemo told him he had not kept any sort of timelog. While these inconsistencies raise some doubts as to the contemporaneousness of the logbook, the regulations state that the taxpayer's records need not be contemporaneous. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. Thus, the fact that the logbook may not be a contemporaneous account of Mr. Adeyemo's 2008 and 2009 rental real-estate activities does not preclude us from relying on it. The thoroughness and consistency of the logbook convince us that it is an accurate account of Mr. Adeyemo's activities. The logbook shows that Mr. Adeyemo spent, at most, 800 hours managing the couple's rental properties in 2008 and 715 hours managing the properties in 2009.[9]

Asserting that the logbook reflects only a portion of the total hours that Mr. Adeyemo devoted to the Adeyemos' rental real-estate business, the Adeyemos also

---

[9]The IRS argues that logbook hours attributable to travel time should not count toward the 750-hour and 50% tests. Sec. 469(c)(7)(B)(i) and (ii). We refrain from deciding this issue as it does not alter the outcome of our inquiry into whether Mr. Adeyemo was a real-estate professional. For 2008 the hours of personal service performed in the rental real-estate business by Mr. Adeyemo-- even including travel time--were less than 50% of his total hours of personal services. For 2009 the hours of personal service performed in the rental real-estate business--even including travel time--were less than 750 hours.

**[\*19]** presented a summary spreadsheet that purportedly provides a complete account of the total hours Mr. Adeyemo spent managing the properties. Mr. Adeyemo testified that he created the spreadsheet just before trial, some three to four years after the tax years at issue.[10] The types of activities listed in the spreadsheet are similar to those listed in the logbook, e.g., showing properties to prospective tenants and overseeing maintenance work. Like the logbook, the activities are listed by date, and each entry includes the time spent on the relevant activity. Mr. Adeyemo explained that the spreadsheet was more comprehensive than the logbook because the spreadsheet included (1) time spent in court in eviction actions, (2) time spent showing properties in addition to time recorded in the logbook, and (3) some travel time in addition to travel time in the logbook. In total, the spreadsheet states that Mr. Adeyemo spent 905 hours in 2008 and 982 hours in 2009 managing the couple's rental properties.

At trial, Mr. Adeyemo testified about how he created the spreadsheet. Mr. Adeyemo explained that, generally, he reviewed his phone records, the logbook,

---

[10]As an out-of-court statement, such a document could potentially be subject to a hearsay objection. See Fed. R. Evid. 802 (prohibiting admission of hearsay), 801(c)(1) (defining hearsay generally as a statement not made while testifying at the trial). However, the parties stipulated that the spreadsheet should be treated by the Court as if Mr. Adeyemo had testified to the contents of the spreadsheet. The Court admitted the spreadsheet with that condition. Under that condition, the spreadsheet is an in-court statement and is not hearsay.

[*20] and newspaper ads for available properties from 2008 and 2009 to get a sense of where he was on a particular day. If he had several calls that were either made from or received in, say, Laurel, and he knew he had a rental listing for a Laurel property around that time, Mr. Adeyemo would assume that he was showing the Laurel property for a few hours that day. He might confirm this assumption by examining logbook entries from that particular date.

For reasons explained below, we find that the spreadsheet is an uncorroborated, post-event "ballpark guesstimate" rather than "reasonable means" of proof. Moss v. Commissioner, 135 T.C. at 369; sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. We observe three principal issues that tend to undermine the reasonableness of the spreadsheet as a method of proof. We discuss each in turn.

The first problem is that the times and activities listed in the spreadsheet are not consistent with either the Adeyemos' testimony or their documentary evidence. Mr. Adeyemo testified that the activities listed in the spreadsheet were derived from his memory as well as from documentary evidence such as receipts, phone bills, the logbook, and newspaper ads. To the extent that the spreadsheet entries are purportedly derived from documentary evidence, the record does not establish a credible link between the spreadsheet and the underlying documents.

**[*21]** For example, most entries include a general reference to a batch of receipts or phone bills. However, the references are too vague and the receipts too disorganized for us to trust that the spreadsheet is corroborated by the underlying documents. In addition, some of the underlying documents are inapposite: Some receipts are from 2006, 2007, and 2010.

An example further illustrates the lack of connection between the spreadsheet and the other documentary evidence. The spreadsheet lists multiple property showings on February 29, 2008. One spreadsheet entry states that Mr. Adeyemo spent 170 minutes showing a property on Montpelier Drive in Laurel on that date. The entry includes the reference "see phone bill". The phone records show that the Adeyemos made calls from or received calls in Laurel on the morning of February 29. However, other than the spreadsheet itself, there is nothing in the record that demonstrates whether the Laurel calls were related to Mr. Adeyemo's rental activities. The fact that the Adeyemos resided in Laurel further complicates this analysis, as there is no evidence that ties Mr. Adeyemo to the property on Montpelier Drive in Laurel (as opposed to the couple's personal residence in Laurel) on that date. The Adeyemos presented no other evidence that would support the proposition that Mr. Adeyemo spent 170 minutes showing the property on Montpelier Drive in Laurel on February 29. The spreadsheet has

[*22] another entry on that date which allocates 210 minutes to a showing at a property on Kinmount Road in Lanham, Maryland.  Again, the entry includes the reference "see phone bill"; however, the phone records do not provide a reliable indication that calls were made from or received in Lanham on that date.

Second, it appears that the spreadsheet describes activities of both spouses.  At first, Mr. Adeyemo testified that the spreadsheet reflected the activities of both him and Mrs. Adeyemo.  In response to an inquiry from the Court during trial, IRS counsel correctly explained that the two requirements for the real-estate professional exception must be independently satisfied by one of the spouses in the case of a joint return.  See sec. 469(c)(7)(B)(i) and (ii).[11]  After he heard this, Mr. Adeyemo changed his testimony to state that the spreadsheet reflected only his activities and that Mrs. Adeyemo performed only minor administrative work.  This testimony is inconsistent with Mrs. Adeyemo's testimony:  She later testified that

---

[11]A treatise states:

> In the case of a joint return, if either spouse single-handedly satisfies both requirements, then all rental real estate activities of both spouses qualify for the exception.  One cannot, however, combine the two spouses' efforts for purposes of satisfying either of the two requirements for individuals (for example, by adding 500 hours of work by one spouse to 300 hours of work by the other in order to reach the more-than-750 hours threshold) * * *

Daniel N. Shaviro, Passive Loss Rules, 549-2nd Tax Mgmt. (BNA) at A-42.

**[*23]** on more than one occasion she spent four hours to five hours cleaning a property. In our view, the spreadsheet reflects significant activities of both spouses. Because section 469(c)(7) requires us to consider the time spent by each spouse individually, the spreadsheet fails as a source of proof that Mr. Adeyemo met the requirements of section 469(c)(7)(B)(i) and (ii).[12]

We also consider whether the Adeyemos' testimony provides an independent basis from which we can determine the number of hours Mr. Adeyemo worked in the couple's rental real-estate business. Both Mr. and Mrs. Adeyemo credibly testified that they put a significant amount of time and effort into managing their rental properties. However, their testimony does not contain a reliable estimate of how much time Mr. Adeyemo spent managing the properties. Mr. Adeyemo perfunctorily testified that he spent at least 1,350 hours on the couple's rental properties. This is the number of hours that would nearly satisfy the first requirement of section 469(c)(7)(B) (that is, if Mr. Adeyemo worked 1,350 hours as a pharmaceutical sales representative--as he testified, at one point, that he did[13]). However, Mr. Adeyemo failed to establish how he arrived at his

---

[12]See supra note 11.

[13]As we explain infra p. 25, we determine that Mr. Adeyemo worked 1,500 hours as a pharmaceutical sales representative in 2008. We need not determine the

(continued...)

**[\*24]** 1,350-hour estimate of hours worked on the rental properties. The logbook states that Mr. Adeyemo worked only 800 hours in 2008 and 715 hours in 2009. Thus, the logbook does not appear to be the basis of his 1,350-hour estimate. Mr. Adeyemo testified that he had not added up the time in the spreadsheet. Therefore, the spreadsheet does not appear to be the basis for his 1,350-hour estimate. Mr. Adeyemo suggested that the primary basis for his estimate is that, as a general proposition, managing seven rental properties is a lot of work. However, such post-event ballpark guesstimates are insufficient for establishing the hours that Mr. Adeyemo spent managing the couple's rental properties. See Moss v. Commissioner, 135 T.C. 365.

After reviewing the record, we conclude that the logbook is the only credible account of the time that Mr. Adeyemo devoted to the Adeyemos' rental properties in 2008 and 2009. On the basis of the logbook, we find that Mr. Adeyemo worked, at most, 800 hours in the couple's rental real-estate business in 2008 and 715 hours in 2009.[14]

---

[13](...continued)
corresponding number of hours for 2009.

[14]See supra note 9.

**[*25]** As Mr. Adeyemo did not devote 750 hours to the couple's rental real-estate business in 2009, he was not a real-estate professional in that year. See sec. 469(c)(7)(B)(ii).

Because Mr. Adeyemo may have worked the requisite 750 hours in 2008, we next determine whether he devoted at least half of his time spent on personal services to the couple's rental real-estate business. See sec. 469(c)(7)(B)(i). Mr. Adeyemo worked as a pharmaceutical sales representative throughout 2008. He testified that he did not have a fixed schedule. At trial Mr. Adeyemo provided inconsistent estimates regarding how many hours he worked at that job in 2008. At one point he testified that he worked approximately six hours per day, five days per week. We find this estimate credible and find that Mr. Adeyemo worked approximately 1,500 hours in 2008.

Since Mr. Adeyemo spent no more than 800 hours on the couple's rental real-estate business in 2008, compared to approximately 1,500 hours working as a pharmaceutical sales representative, he did not satisfy the first prong of section 469(c)(7)(B). Therefore, Mr. Adeyemo was not a real-estate professional in 2008.

As Mr. Adeyemo was not a real-estate professional in 2008 or 2009, the Adeyemos' rental real-estate business is a passive activity. See sec. 469(c)(2).

**[*26]**  2.  <u>Whether the allowance provided by section 496(i) applies to the Adeyemos' rental real-estate business</u>

The Adeyemos raise the alternative argument that, if Mr. Adeyemo does not satisfy the exception for real-estate professionals, they may still deduct $25,000 in rental losses from nonpassive income pursuant to section 469(i).  The provision is available to individual taxpayers that actively participate in rental real-estate activities during the year in which the loss arises.  The allowance phases out for taxpayers with adjusted gross incomes exceeding $100,000 and is completely phased out for taxpayers with adjusted gross incomes exceeding $150,000.  Sec. 469(i)(3)(A).  In determining adjusted gross income for this purpose, passive activity losses, and losses allowed by reason of the real-estate professional exception, are disregarded.  Sec. 469(i)(3)(F)(iv).  That is, a taxpayer cannot reduce his or her adjusted gross income by passive activity losses nor any losses attributable to rental activity (regardless of whether the rental activity is passive).  <u>See</u> sec. 469(i)(3)(F)(iv), (c)(7)(A)(i), (2).

The Adeyemos' assertion that they are entitled to relief pursuant to section 469(i) fails.  The Adeyemos reported total wage income of $232,992 and $175,354 for 2008 and 2009, respectively.  These amounts exceed the $150,000 adjusted-gross-income cap found in section 469(i)(3)(A).  <u>See also</u> secs. 62 (defining

[*27] adjusted gross income as gross income reduced for enumerated deductions (none of which are applicable here)), 61 (defining gross income to include compensation for services). Losses from their rental activities do not offset their adjusted gross incomes for those years. See sec. 469(i)(3)(F)(iv). Thus, they do not qualify for any portion of the $25,000 allowance provided by section 469(i).

3. Deductions for rental real-estate business, medical expenses, and charitable contributions

a. Business-expense deductions reported on Schedules E

Section 162 allows deductions for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including expenses for repairs, advertising, and supplies.

The notice of deficiency determined that some deductions the Adeyemos claimed for the expenses of their rental real-estate business should be disallowed for lack of substantiation. The Adeyemos seemingly challenged this determination, stating in their brief that, "the amount of adjusted income * * * should * * * be adjusted to include all or portions of the expenses that were denied during the initial review". In challenging this aspect of the notice of deficiency, the Adeyemos have failed to meet the Court's briefing requirements. Rule 151(e)(3) requires a party to include in his or her brief proposed findings of fact

[*28] with references to evidence relied upon. Rule 151(e)(5) requires a party to state his or her argument in the brief, including a discussion of any disputed factual issues. The Adeyemos' brief points to no specific support, from the record or elsewhere, for the proposition that they are entitled to deductions for their rental real-estate business that were disallowed on lack-of-substantiation grounds. The brief's failure to advance this issue beyond a vague assertion convinces us that the Adeyemos have waived the issue. See Rule 151(e)(3), (5); Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, slip op. at 40 n.13 (applying Rule 151(e)(3) and (5) and explaining that the taxpayer's "failure to argue the issue beyond a vague assertion * * * leads us to conclude that the issue has been waived"), aff'd, 431 Fed. Appx. 544 (9th Cir. 2011); cf., e.g., D'Errico v. Commissioner, T.C. Memo. 2012-149, slip op. at 19 ("We need not (and will not) undertake the work of sorting through every piece of evidence petitioners have provided in an attempt to find support for petitioners' ultimate legal positions taken in this case.").

     b.     Itemized deductions reported on Schedules A

The Adeyemos assert that they are entitled to charitable-contribution and medical-expense deductions in excess of what was allowed in the notice of deficiency. However, the Adeyemos have not provided any evidence at all with respect to these deductions. The Adeyemos' blanket assertions in their brief that

[*29] they are entitled to the deductions are not evidence. See Rule 143(c). As the Adeyemos have failed to meet their burden of proof with respect to these items, we find that they are not entitled to any additional deductions for charitable contributions or medical expenses.

4.    <u>Whether the Adeyemos were insolvent immediately before they received a discharge of $32,926 in credit-card debt in 2009</u>

The Adeyemos conceded that in 2009 they received a discharge of $32,926 in credit-card debt. The Adeyemos contend, however, that the amount is excludable from their income because they were insolvent immediately before the discharge. See sec. 108(a)(1)(B).

Section 61(a) defines gross income as "all income from whatever source derived" including income from discharge of indebtedness. Sec. 61(a)(12). Section 108(a) provides certain exceptions under which discharge-of-indebtedness income is excluded from income. One such exception arises where the taxpayer is insolvent immediately before the discharge. Sec. 108(a)(1)(B), (d)(3). Insolvent means that the taxpayer's liabilities exceed the fair market value of his or her assets. Sec. 108(d)(3). The amount of the exclusion is limited to the amount by which the taxpayer is insolvent, i.e., the amount by which the taxpayer's liabilities exceed the fair market value of his or her assets. Sec. 108(a)(3), (d)(3); see also

[*30] <u>McAllister v. Commissioner</u>, T.C. Memo. 2013-96, at *7 ("The amount by which the taxpayer is insolvent is defined as the excess of the taxpayer's liabilities over the fair market value of the taxpayer's assets.").

Taxpayers who, like the Adeyemos, bear the burden of proof regarding the insolvency exception, must prove that their total liabilities exceeded the fair market value of their assets immediately before the discharge. <u>See</u> <u>Merkel v. Commissioner</u>, 109 T.C. 463, 476 (1997), <u>aff'd</u>, 192 F.3d 844 (9th Cir. 1999). The Adeyemos have made no such showing. At trial Mr. Adeyemo testified that the couple had over $2.2 million in debt outstanding at the time the credit-card debt was discharged; however, the Adeyemos failed to provide any other evidence supporting that assertion or any explanation for their failure to do so. Further, the Adeyemos did not provide any evidence of the fair market value of their assets. As a result, we have no information upon which to base a finding of insolvency even if we were to take the Adeyemos' assertion as to their outstanding liabilities at face value (which we do not). <u>See</u> <u>id.</u> (a component of the taxpayer's burden in showing that he or she is insolvent includes proof of the fair market value of the taxpayer's assets). As the Adeyemos have not met their burden of proof with respect to this matter, we find that the Adeyemos were not insolvent at the time of

**[\*31]** discharge. Thus, they are not entitled to exclude the amount of the discharge from income.

5.      Whether the Adeyemos are liable for accuracy-related penalties under section 6662(a)

Section 6662(a) imposes a 20% penalty on an underpayment of tax attributable to any of the causes listed in section 6662(b). These causes include "(1) Negligence or disregard of rules or regulations" and "(2) Any substantial understatement of income tax." A substantial understatement is defined as any understatement exceeding the greater of "(i) 10% of the tax required to be shown on the return for the taxable year, or (ii) $5,000." Sec. 6662(d)(1).

With respect to any penalty, section 7491(c) imposes the burden of production on the IRS. Higbee v. Commissioner, 116 T.C. at 446. This requires the IRS to come forward with evidence indicating that it is appropriate to impose the relevant penalty. Sec. 7491(c); Higbee v.Commissioner, 116 T.C. at 446. Once the IRS has met this burden, the taxpayer bears the burden of proving that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. Higbee v. Commissioner, 116 T.C. at 447. The penalty under section 6662(a) does not apply if the taxpayer can demonstrate that the taxpayer (1) had reasonable cause for the underpayment and (2) acted in

**[*32]** good faith with respect to the underpayment. Sec. 6664(c)(1). The regulations provide that reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances:

> Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * * * Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * *

Sec. 1.6664-4(b)(1), Income Tax Regs. To establish good faith and reasonable cause through reliance on professional advice the taxpayer must show that "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). To satisfy the third prong of this test, the taxpayer must show that the tax professional "opine[d] on the legitimacy" of the aspects of the return that were challenged by the IRS. Id. at 100.

For 2008 and 2009 the IRS imposed accuracy-related penalties on the Adeyemos due to negligence or, alternatively, substantial understatements of

[*33] income tax. The Adeyemos' understatements exceed 10% of the tax required to be shown on the returns, which is greater than $5,000 for each year. See sec. 6662(d)(1). Accordingly, we need not determine whether the Adeyemos were negligent.[15]

The Adeyemos assert a defense based on reasonable cause and good faith. See sec. 6664(c)(1). We consider two possible theories for the Adeyemos' defense. The first is that they personally made a reasonable, good-faith attempt to assess their proper tax liabilities. With respect to the couple's rental losses, Mr. Adeyemo testified that he began to track the time he spent managing the couple's rental activities at the suggestion of the couple's accountant. While maintaining the logbook reflects a degree of effort, there is no evidence suggesting that the couple relied on the logbook when filing their returns, nor that they made any attempt to understand the passive-activity-loss rules. Similarly, the record reveals that the Adeyemos maintained records for some of their business expenses but not

---

[15]The IRS asserted on brief that Mr. Adeyemo conceded the accuracy-related penalties on behalf of the Adeyemos at trial. However, it is possible that Mr. Adeyemo's purported concessions were based on a misunderstanding of the relevant issues. As we find that the Adeyemos are liable for accuracy-related penalties regardless of whether they conceded them, we do not decide whether they did indeed concede the accuracy-related penalties.

[*34] all of them. There is nothing in the record suggesting that these excess deductions were the result of honest mistake or reasonable cause.

The second theory for the Adeyemos' defense we consider is that they relied on the advice of an accountant in filing their returns. The evidence related to the accountant's preparation of the Adeyemos' returns shows only that the accountant did in fact prepare the couple's 2008 and 2009 returns and that the accountant encouraged Mr. Adeyemo to keep a log of the couple's rental activities. The fact that the Adeyemos had an accountant prepare their returns does not, in and of itself, prove that they acted with reasonable cause and in good faith. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99-100. Importantly, the Adeyemos presented no evidence indicating that they gave the accountant all necessary and accurate information or that the accountant made a considered judgement about the aspects of the return later challenged by the IRS. Id.

As the Adeyemos have not met their burden of proof with respect to the reasonable-cause-and-good-faith defense, we find that the section 6662(a) accuracy-related penalties are appropriate.

**[\*35]** We have considered all of the arguments that the parties have made, and to the extent that we have not discussed them, we find them to be irrelevant, moot, or without merit.

<u>Decision will be entered</u>

<u>for respondent</u>.